IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| LINDSEY MEREDITH CARON | ) |
| Plaintiff, | ) ) ) | 
| vs. | ) ) |
| SOUTHEASTERN FREIGHT LINES, INC., | ) ) ) |
| Defendants. | ) ) ) |

Case No.: 3:23-cv-4446-SAL

**COMPLAINT**

Plaintiff Lindsay Meredith Caron, complaining of the Defendant Southeastern Freight Lines, Inc. ("Southeastern") alleges and shows unto the Court that:

**INTRODUCTION**

1. This is a claim to recover damages for injuries sustained as a result of a motor vehicle collision that occurred on September 3, 2020 in Buncombe County, North Carolina (the "Collision"), which was caused by the negligent and reckless driving of Southeastern's Driver, Alva Lunsford, who was driving a box truck as an agent of Southeastern Freight Lines, Inc. The Collision caused Plaintiff Lindsey Meredith Caron to suffer serious bodily injury and other damages.

**PARTIES AND JURISDICTION**

2. At all times relevant hereto, Plaintiff was citizen and resident of Buncombe County, North Carolina

3. Upon information and belief, Southeastern Freight Lines, Inc ("Southeastern") is domestic entity organized and existing under the laws of South Carolina. Its registered agent is Clifford L. Bourke, Jr., at 420 Davega Road, Lexington, South Carolina 29073.

1

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.

5. The Columbia Division of the United States District Court for the District of South Carolina is the appropriate Division with which to bring this action because: a) a Defendant is a domestic entity organized and existing under the laws of South Carolina registered to do business and resides or has a principal place of business in the Division; and, b) the corporate Defendant does business relating to the events or omissions alleged within the Division.

## FACTS

6. On or about September 3, 2020, and at or about 16:44, Ms. Caron was traveling northeast on Glenn Bridge Road in Asheville, North Carolina.

7. At the same time, James Alva Lunsford, II ("Lunsford"), was operating a box truck owned and operated by Southeastern ("the Southeastern Truck"). Lunsford was operating the Southeastern Truck at LCL Business Park Circle and entering Glenn Bridge Road from the LCL Business Park.

8. As Ms. Caron was traveling northeast on Glenn Bridge Road, Mr. Lunsford turned his vehicle from a LCL Business Park Circle onto Glenn Bridge Road and collided directly into Ms. Caron's vehicle, causing her vehicle to spin, run off the road and collide with a mailbox and utility pole before coming to rest on the side of the road ("the Collision").

9. As a result of the Collision, Ms. Caron suffer and sustain the following injuries and damages:

   a) Extensive pain, physical injury, mental anguish, suffering and discomfort;

   b) Shock and trauma;

   c) Medical evaluation and treatment;

d) Permanent injuries;

e) Permanent scarring;

f) Emotional trauma and distress;

g) Loss of enjoyment of life;

10. The collision occurred because Lunsford operated the Southeastern Truck in a negligent, negligent per se, grossly negligent, reckless and wanton manner, causing the collision, including but not limited in the following manners:

a) Failing to exercise the care of an ordinary and prudent person;

b) Failing to maintain a proper lookout;

c) Failing to yield the right of way;

d) Failing to ascertain before moving from a stopped position that that it could be done safely, without colliding with the Caron Vehicle;

e) By operating in a careless and heedless manner and with willful or wanton disregard of the safety of others, in violation of G.S. 22-140(a);

f) Failing to keep his vehicle under control;

g) Failing to exercise reasonable care to avoid colliding with another vehicle lawfully on the roadway; and

h) Failing to operate his vehicle in a reasonably safe manner;

i) In failing to attempt to take any precautions for his own safety or for the safety of Ms. Caron;

j) In failing to use that degree of care and caution which a reasonable person would have used under the circumstances then and there existing; and

k) In such other particulars that may be discovered before and at trial.

All of which are in violation of and contrary to the common and statutory laws of the State of North Carolina and the rules and regulations of the North Carolina Department of Public Safety.

11. Caron is without any fault, did not cause or bring about the Collision, and could not have avoided the Collision.

12. As a result of Collision, Caron suffered great bodily injury, including shattered glass lodging into to her left arm and has otherwise been damaged.

13. Lunsford's negligent, negligent per se, willful, wanton, and/or reckless conduct and the breaches of the duties that he owed to Caron was a direct and proximate cause of the Collision described herein.

14. As a direct and proximate result of the negligence, gross negligence, negligence per se, carelessness, recklessness, and failure of Defendant's Driver to show the requisite care under the circumstances, Caron suffered physical injuries, permanent impairment, permanent visible scarring, discomfort, loss of quality of life, mental anguish, pain and suffering and has otherwise been damaged in an amount to be determined by the jury.

15. Upon information and belief, Lunsford was an employee, borrowed servant, agent, or apparent agent of Southeastern Freight Lines, Inc. acting within the course and scope of such employment or agency of Southeastern Freight Lines, Inc.  As such, Southeastern Freight Lines, Inc. is vicariously liable for all acts and omissions of Lunsford.

16. Southeastern Freight Lines, Inc. is a motor carrier within the meaning of the Federal Motor Carrier Safety Act and implementing regulations.

17. Upon information and belief, Southeastern Freight Lines, Inc. had a duty to adequately train, monitor and supervise Lunsford. To the extent that Southeastern Freight Lines,

4

Inc. was negligent in their hiring, training, supervision or retention of Lunsford, such negligence was an additional proximate cause of the Collision and Southeastern Freight Lines, Inc. is directly liable for its own negligence in bringing about the Collision.

18. Upon information and belief, Lunsford was an employee of Southeastern acting within the course and scope of his employment with Southeastern, or was otherwise acting as an agent, apparent agent, or servant of Southeastern within the course and scope of such agency, apparent agency, or master-servant relationship.

## FOR A FIRST CAUSE OF ACTION
## (COMMERCIAL MOTOR VEHICLE NEGLIGENCE)

19. Plaintiff repeats and realleges as if verbatim paragraphs 1-12 above.

20. At all times relevant to this Complaint, Lunsford was operating a commercial motor vehicle transporting property in interstate commerce.

21. In order to undertake such actions, Southeastern's Driver is required to have, at a minimum, the knowledge and skills necessary for the safe operation of the commercial motor vehicle.

22. The safe operation of commercial motor vehicles requires specialized knowledge and additional training not necessary for the operation of a passenger vehicle because:

   a) Commercial motor vehicles are heavier than passenger vehicles and take longer to stop, as compared to a passenger car operating at the same pre-braking speed;

   b) Commercial motor vehicles are heavier and longer than passenger vehicles and take longer to execute turning and lane change maneuvers, and take more room to enter traffic, as compared to passenger vehicles operating at the same pre-turn or lane-change speed;

c) Commercial motor vehicles are heavier than passenger vehicles and cause more significant property damage and/or personal injury or death in collisions, as compared to passenger cars operating at the same pre-collision speed and trajectory;

d) Commercial motor vehicles pose more of a risk of causing personal injury, death or property damage in a collision, as compared to a collision involving a passenger vehicle operating at the same pre-collision speed and trajectory.

23. In order to undertake the safe operation of a commercial motor vehicle, drivers such as Lunsford must have knowledge and skills in many areas, including the following:

a. The procedures for safe vehicle operations;

b. The proper procedures for performing basic maneuvers such as turning;

c. The importance of conducting a proper visual search;

d. The importance of proper search methods, including seeing ahead and to the sides, and using mirrors;

e. The principles and procedures for proper communications and the hazards of failing to signal properly, including signaling intent and communicating presence;

f. The importance of understanding the effects of speed, including speed and visibility and speed and traffic flow; and

g. The procedures and techniques for controlling the space around the vehicle, including the importance of space management, space cushions, space to the sides, and space for traffic gaps.

24. In addition to the basic knowledge and skills required of commercial motor vehicles drivers, it is standard in the industry for drivers to be aware of the size and weight of their vehicles when entering traffic.

25. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard for drivers to understand that because of slow acceleration and the large space gap commercial vehicles require, commercial vehicles need a much larger gap to enter traffic than in a passenger car.

26. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that acceleration varies with the load, and to allow more room if their vehicle is heavily loaded.

27. In addition to the basic knowledge and skills required of commercial motor vehicle drivers, it is standard in the industry for drivers to understand that before they start to cross or enter a road, to make sure the vehicle can get all the into their lane or all the way across the road before traffic reaches the vehicle.

28. The injuries and damages incurred by Ms. Caron were directly and proximately caused by Defendant's Driver's careless, negligent, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars:

    a) Failing to exercise the care of an ordinary and prudent person;

    b) Failing to maintain a proper lookout;

    c) Failing to yield the right of way;

    d) Failing to ascertain before moving from a stopped position that that it could be done safely, without colliding with the Caron Vehicle;

    e) By operating in a careless and heedless manner and with willful or wanton disregard of the safety of others, in violation of G.S. 22-140(a);

    f) Failing to keep his vehicle under control;

g) Failing to exercise reasonable care to avoid colliding with another vehicle lawfully on the roadway; and

h) Failing to operate his vehicle in a reasonably safe manner;

i) In failing to attempt to take any precautions for his own safety or for the safety of Ms. Caron;

j) In making a right hand turn from the business park into an oncoming vehicle's path of travel;

k) In failing to follow the proper procedures for safe commercial vehicle operations;

l) In operating a commercial motor vehicle when he was not qualified to do so;

m) In failing to use that degree of care and caution which a reasonable person would have used under the circumstances then and there existing; and

n) In such other particulars that may be discovered before and at trial.

All of which are in violation of and contrary to the common and statutory laws of the State of North Carolina and the rules and regulations of the North Carolina Department of Public Safety.

29. Southeastern is liable for the acts and omissions of Lunsford under the doctrines of respondeat superior, master/servant, and/or agent/principal.

30. At all times relevant to this Complaint, Lunsford was operating a commercial motor vehicle in interstate or intrastate commerce under the USDOT authority granted to Southeastern.

31. Southeastern is liable for the acts and omissions of Lunsford while he was operating under its authority by virtue of the Federal Motor Carrier Safety Regulations.

32. The Plaintiff is informed and believes that she is entitled to judgment against Southeastern for actual and punitive damages in an appropriate amount.

FOR A SECOND CAUSE OF ACTION

33. Plaintiff repeats and realleges as if verbatim paragraphs 1-24 above.

34. Southeastern operates as a commercial motor carrier.

35. In return for the privilege to operate commercial motor vehicles on the public roadways, prospective motor carriers must make certain safety related certifications and verifications.

36. Motor carriers such as Southeastern are required to submit a Form MCS-150 to the Federal Motor Carrier Administration and obtain an USDOT number.

37. Each Form MCS-150 Southeastern submitted or will submit contains a Certification Statement whereby Southeastern declares under the penalty of perjury that it is familiar with the Federal Motor Carrier Safety Regulations and/or Federal Hazardous Materials Regulations.

38. Motor Carriers such as Southeastern are required to submit a Form OP-l to the Federal Motor Carrier Administration in order to gain interstate operating authority.

39. Upon information and belief, the Form OP-l submitted by Defendant Southeastern contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they are subject to the pertinent portions of the U.S. DOT's Federal Motor Carrier Safety Regulations ("FMCSR") at 49 CFR, Chapter 3, Subchapter B (Parts 350-399).

40. The Form OP-l submitted by Southeastern contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that they have access to and are

familiar with all applicable U.S. DOT regulations relating to the safe operation of commercial vehicles and that they will comply with the regulations.

41. Each Form OP-l submitted by Southeastern contains a "Safety Certification", certifying to the Federal Motor Carrier Safety Administration that, at a minimum, they:

    a) have in place a system and an individual responsible for ensuring overall compliance with the FMCSR;

    b) Can produce a copy of the FMCSR;

    c) have in place a driver safety training/orientation program;

    d) are familiar with DOT regulations governing driver qualifications and have in place a system for overseeing driver qualification requirements (49 CFR Parts 391); and,

    e) have in place policies and procedures consistent with DOT regulations governing driving and operational safety of motor vehicles.

42. Reasonably safe motor carriers develop and implement policies, practices, and procedures to give effect to the minimum safety standards contained in the Federal Motor Carrier Safety Regulations to reduce or eliminate preventable collisions that may cause injury, death, or property damage on the public roadways.

43. Reasonably safe motor carriers train and educate their drivers regarding the safe operation of commercial motor vehicles.

44. Reasonably safe motor carriers utilize information and training materials from industry associations and third party safety vendors such as J.J. Keller & Associates, Inc., the "Smith System," Pro-Tread, and/or the National Safety Council to train and educate their drivers regarding the safe operation of commercial motor vehicles.

45. The safe operation of commercial motor vehicles includes practices and procedures related to speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness.

46. Reasonably safe motor carriers utilize publicly available government, industry, and trade publications regarding the preventability of highway collisions to design, develop, and implement safety management controls which are designed to reduce collisions involving commercial motor vehicles.

47. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

48. To be qualified to operate a commercial motor vehicle, a driver must have experience and/or training to safely operate the type of vehicle; must be physically qualified; must have a currently valid CDL, and must furnish the motor carrier a list of current driving violations.

49. To operate a commercial motor vehicle under Southeastern's operating authority, the prospective driver is required to complete a written application containing the following information:

    a) the nature and extent of the driver's experience;

    b) a list of all accidents in the previous 3 years;

    c) a list of all violations of motor vehicle laws in the previous 3 years;

    d) a detailed description of any denial, revocation, or suspension of any drivers licenses or permits;

    e) employment information for the previous 3 years; and

  f) the names of all employers for whom the driver has operated a commercial motor vehicle for the previous 7 years.

50. Before a motor carrier such as Southeastern may allow or permit a driver to operate a commercial motor vehicle under its operating authority, the motor carrier must:

  a) obtain the driver's motor vehicle record from the applicable state agency for the previous 3 years; and

  b) investigate the driver's safety performance history with all DOT regulated employers for the previous 3 years;

51. Once a motor carrier such as Southeastern hires a commercial driver, every twelve months thereafter the driver must submit a written list of all traffic violations the driver received in those twelve months.

52. Once a motor carrier such as Southeastern hires a commercial driver, every twelve months thereafter the motor carrier must obtain from the relevant state agency a list of traffic violations for the previous year and maintain a copy of the record in the driver's qualification file.

53. Motor carriers such as Southeatern are required to maintain a Driver Qualification File meeting the requirements of 49 CFR § 391.51 for the duration of the driver's employment with the motor carrier plus three years.

54. In addition, drivers employed by, or operating under the authority of, motor carriers such as Southeastern, are required to complete and turn in to their employer trip envelopes at least every 13 days. Such trip envelopes include, but are not limited to, the driver's daily Record of Duty Status logs and pre-trip and post-trip vehicle inspection reports.

55. Drivers' daily logs record how much time each driver spends on duty, on duty not driving, off duty, and in a sleeper birth. Driver logs also require drivers to indicate how many miles they drove during each 24 hour period and their locations at each change of duty status.

56. In addition to the required daily logs and vehicle inspection reports, it is standard in the industry for motor carriers also to collect information from their drivers, such as fuel receipts, entry and departure records, and other supporting documentation that verifies the times that their drivers were at specific locations.

57. In addition to the required daily logs, vehicle inspection reports, and supporting documentation, reasonably safe motor carriers utilize available technology such as GPS tracking systems and in cab communications systems to monitor the safety performance of their drivers.

58. It is standard in the industry for motor carriers to use the information contained in the required daily driver logs, vehicle inspection reports, and other supporting documents to audit the safety performance of their drivers.

59. It is also standard in the industry for motor carriers to use any additional information, such as in-cab communications and GPS tracking to audit the safety performance of their drivers.

60. It is standard in the industry for motor carriers to use the information contained in the required daily driver logs, vehicle inspection reports, and other supporting documentation to audit the safety performance of their drivers to ensure that their drivers are not violating hour of service rules, to ensure that their drivers do not average speeds in excess of what is safe, and otherwise verify that the information contained in the driver's logs is accurate and truthful.

61. Auditing drivers' daily logs, vehicle inspection report, supporting documents, incab communications, and GPS tracking information increases the likelihood that a motor carrier's drivers are operating their commercial vehicles safely and decreases the risk of a preventable crash.

62. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver is not qualified to do so.

63. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, incab communications, and GPS tracking information indicates that the driver has a higher than safe average speed.

64. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, in-cab communications, and GPS tracking information indicates that the driver operates his vehicle in violation of the hours of service rules.

65. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if an audit of the driver's logs, vehicle inspection reports, supporting documents, incab communications, and GPS tracking information indicates that the driver is not accurate and truthful in the completion of his logs.

66. Motor carriers should never allow or permit a driver to operate their commercial motor vehicles if the driver does not have the required knowledge or skill to safely operate the vehicle.

67. It is standard in the industry for careful motor carriers to regularly check their Safety Measurement System details.

68. The FMCSA's Safety Measurement System (SMS) provides an assessment of a motor carrier's on-road performance results within seven safety related categories. Motor carriers are scored on a percentile basis as compared to other similar carriers.

69. It is standard in the industry for motor carriers to regularly monitor their SMS scores and to address any areas of noncompliance before they lead to collisions.

70. Upon information and belief, the injuries and damages incurred by the Plaintiff were directly and proximately caused by Southeastern's careless, negligent, grossly negligent, willful, wanton, reckless, and unlawful acts in one or more of the following particulars by failing to use reasonable care in the:

  a) failing to design, develop, and implement adequate safety management controls related to speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness;

  b) failing to train Defendant's Driver regarding speed management, space management, seeing ahead, total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness;

  c) failing to properly monitor and supervise the driving habits of Defendant's Driver;

  d) Supervision of its business operations in failing to properly monitor the driving habits and records of its drivers, employees, and/or agents, specifically the Defendant's Driver;

e) Supervision of its drivers, employees, and/or agents, specifically the Defendant's Driver;

f) Instruction of its drivers, employees, and/or agents, specifically Defendant's Driver;

g) Entrustment of the Southeastern Truck to its drivers, employees, and/or agents, specifically Defendant's Driver;

h) Compliance with federal and/or state regulations and industry standards, as referenced in this Complaint and as may be developed during the discovery in this case;

i) Improperly auditing the logs and supporting documentation of its drivers, employees, and/or agents, specifically Defendant's Driver;

j) Failing to utilize available information and technology to properly monitor its drivers, employees, and/or agents, specifically Defendant's Driver for compliance with company polices and/or state and federal regulations;

k) In allowing Defendant's Driver to operate a commercial motor vehicle despite knowledge of his inability to do so safely;

l) In failing to have adequate safety management controls in place to ensure compliance with the required safety fitness standard;

m) In failing to budget an appropriate amount of money to design, develop, and implement safety management controls in the areas of speed management, space management, seeing ahead total stopping distance, the principles and procedures for proper turns, entering traffic, hazard perception, accident countermeasures, and fatigue and distracted driving awareness; and,

n) In failing to utilize available technology to monitor and audit the safety performance of its driver's including Defendant's Driver.

71. Southeastern's careless, negligent, willful, wanton, reckless and unlawful acts were the direct and proximate cause of the collision and resulting injuries and damages to Plaintiff.

WHEREFORE, the Plaintiff prays for judgment against the Defendant for actual and punitive damages in an appropriate amount to be determined at trial in excess of $75,000.00, the costs of this action, and for such other and further relief as the Court may deem just and proper.

Respectfully submitted this 1st day of September, 2023

WHITFIELD-CARGILE LAW, PLLC

s/Davis A. Whitfield-Cargile
Davis A. Whitfield-Cargile
State Bar No. 46833, Fed. Bar. 10677
P.O. Box 1101
23 S. Broad Street, Suite 204
Brevard, NC 28712
Phone: 828/884-4529
Fax:    828/884-4528
E-mail:davis@whitfieldcargilelaw.com
*Attorney for Plaintiff*

September 1, 2023